UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CR-20343-KMW

**UNITED STATES OF AMERICA**

vs.

**JORGE MIGUEL VASQUEZ,**

       **Defendant.**
_____/

## OPPOSITION TO MOTION TO SUPPRESS

The United States of America, by and through undersigned counsel, respectfully submits this opposition to Defendant Jorge Miguel Vasquez's motion to suppress (ECF No. 128). The detention, seizure, and search of defendant Vasquez's electronic devices fell squarely within the border search exception to the Fourth Amendment's warrant requirement. The timing of securing subsequent search warrants to expand the initial border search was not unreasonable given the defendant's cooperation with the government and other context described below. The motion should be denied.

## BACKGROUND

The charges in this case stem from an initial investigation in August 2017 by the Philippine National Bureau of Investigation ("NBI") of wire transfers involving a former Philippine government official, Defendant Juan Andres Donato Bautista, and offshore accounts associated with Shell Company X,[1] Shell Company Y, and Baumann Enterprises Limited ("BEL"), a foreign shell company in the British Virgin Islands owned by Bautista. In approximately January 2018, the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI") opened an investigation after reviewing materials shared by NBI reflecting offshore transfers to accounts

---

[1] This response refers to individuals and entities as described in the Indictment.

associated with Bautista.  Over the next several months, HSI obtained financial records from the Federal Reserve Bank of New York (Fedwire) and The Clearing House of Payments Company (CHIPS) that corroborated the information provided by NBI, including wire transfers from Shell Companies X and Y bank accounts in Hong Kong, through correspondent bank accounts in New York, to Bautista's BEL Account in Singapore.  Fedwire and CHIPS records further revealed millions of dollars of financial transfers from the two shell companies in Hong Kong to companies registered in the Southern District of Florida—U.S. Front Company A and U.S. Front Company B—as well as Belize Company 1.  After tracing wires to these entities, the government learned that Vasquez, along with another individual, was a director of U.S. Front Companies A and B.

In approximately February 2019, HSI obtained bank records showing that Shell Companies X and Y had wired over $1 million into accounts owned or controlled by Vasquez.  Around this time, HSI learned from payroll records and loan application documents that Vasquez was employed by Company 1 in Boca Raton, Florida.  After discovering this connection, the government submitted Vasquez's name to the Department of Homeland Security TECS System to monitor his travel.

The government expects the hearing evidence will show that, on or about April 3, 2019, HSI learned that Vasquez would be onboard an April 5, 2019 inbound flight from Taipei, Taiwan to San Francisco International Airport (SFO).  HSI SA Leo Benavente was placed in contact with HSI's duty agent at SFO, SA Jason Ko.  On April 3, 2019, at SA Ko's request for the factual basis for the border search, SA Benavente emailed the following "Reasonable Suspicion Statement" to SA Ko:

> HSI SAC Miami Special Agents in the Illicit Proceeds and Foreign Corruption Investigations Group are working a proactive criminal investigation involving Jorge VASQUEZ.  From information obtained, VASQUEZ is believed to be engaging in money laundering activities and is acting as a conduit to receive illicit proceeds from abroad.  HSI Miami respectfully requests a secondary inspection to be conducted on VASQUEZ pursuant to a Child Porn Border Search Authority ruse . . . . [P]lease detain any[/]all electronic media for forensic

2

exploitation pursuant [to] border search authority. Attempt to obtain any/all corresponding pass/access codes for each device and document on 6051 (i.e. I-phone, laptop codes).

According to the U.S. Customs and Border Protection ("CBP") Air/Sea Inspection report:

On April 05, 2019, Global Entry Member, United States Citizen VASQUEZ, Jorge Miguel [identifying information omitted, including an address in Davie, Florida] arrived at the San Francisco International Airport onboard United Airlines flight# 872 from Taipei, Taiwan. VASQUEZ was traveling on his valid USA Passport# [XXXXXXXX]. VASQUEZ has a Homeland Security Investigation L/0 record for detention of electronic media.

At 0607 HRS, VASQUEZ was referred from the Global Entry Kiosk to report to passport control, which was stated on his CBP FORM 7662.

At 0611 HRS, Passport Control CBPO KWAK referred VASQUEZ to baggage control due to VASQUEZ being under investigation by HSI Miami. PERT CBPO LATOZA presented himself to VASQUEZ for a baggage examination. PERT CBPO LATOZA obtained a binding declaration from VASQUEZ and completed the baggage examination. The interview/examination yielded the following information:

VASQUEZ stated he visited the countries of Hong Kong and Taiwan for business. VASQUEZ stated he is employed as an engineer for a company called "[Company 1]". VASQUEZ provided a business card which displayed [contact information at Company 1].

VASQUEZ declared carrying $5000.00 USD cash. VASQUEZ declared food items such as snacks. VASQUEZ declared personal items such as clothing, laptop computer and cell phones.

Baggage examined. No other derogatory information/items found. At 0640 HRS, VASQUEZ was turned over to Homeland Security Investigations Agent Ko for further examination.

The HSI Incident Report stated:

On April 5, 2019, HSI Miami Agents requested a Border Search be conducted on VASQUEZ upon arrival into the United States. VASQUEZ arrived at San Francisco International Airport (SFO) aboard United Flight 872 from Taipei, Taiwan[2] and was subsequently escorted to Secondary by CBP Officers and HSI Agents. As [a] result, Special Agents detained the following items pursuant to the ongoing money laundering investigation: Line Item 1: Apple Mac Book Air. Line Item 2: iPhone 7 Plus (Apple I-Phone password: XXXXXXXX). These items were subsequently transported to the HSI SAC Miami Office for further forensic analysis.

---

[2] Vasquez's flight itinerary continued from SFO to the Southern District of Florida.

3

Vasquez's iPhone and MacBook (hereinafter, "the devices") were not cleared to pass through customs. Other than reviewing the reasonable suspicion statement, SA Ko's role was limited to detaining (known as "bagging and tagging") the devices at SFO airport. SA Ko noted an 8-digit number that corresponds to the iPhone's password in the "Remarks" section of the Custody Receipt for Seized Property and Evidence (DHS Form 6051). SA Ko provided Vasquez a copy of the DHS Form 6051. The lead agents out of HSI Miami did not ask SA Ko to search the devices and he did not conduct any form of search of the devices before transporting them to HSI Miami.

During the secondary inspection, Vasquez asked SA Ko "when he would get them (the devices) back." Mot. 12. As part of the secondary inspection, SA Ko provided his contact information to Vasquez. SA Ko contacted the lead agents in Miami to understand any concerns relating to operational safety or destruction of evidence. On April 8, 2019, Vasquez contacted SA Ko to inquire about the timing of the return of his devices. On April 9, 2019, SA Ko emailed SA Benavente, copying SA Almeida: "Vasquez inquired about his media yesterday. He was worried he may be fired from his job since he needs them to do his job. Do you have a desk number I can forward to him?" In response, SA Almeida asked SA Ko for Vasquez's phone number, which SA Ko provided and said, "Perhaps you guys can convince him to provide the password." SA Almeida responded:

> We'll reach out to him within the next week or so. If he calls again, advise him that his equipment has been sent to Miami for processing and we'll return it to him ASAP, provided that: 1. We are able to examine it [and] 2. That we don't find any contraband (i.e. Child Porn, etc.).

On April 8, 2019, HSI Miami received the devices. HSI used forensic tools—Cellebrite (for the iPhone) and Axiom (for the laptop)—to extract data and examine the devices using keyword searches. After the initial extraction of images and data from the iPhone using the Cellebrite

4

software, the agents and analysts limited searches to the extracted subset of the iPhone's contents "tagged" as potentially relevant, and did not later expand searches to incorporate new investigative leads.  HSI protocol contemplates completing an initial review of devices within 30 days of detention and requires supervisory approval for any extensions.  On May 3, 2019, HSI "seized" the devices based upon review of "tagged" evidence supporting a money laundering conspiracy.

During May 2019, the government reviewed the laptop contents using Axiom and discovered evidence regarding BEL, Shell Company Y, U.S. Front Company A, and Co-Conspirator 1, as well as references on the iPhone to Philippine Metals Company, whose role was not fully understood at the time by law enforcement.  HSI concluded the border search of both devices by approximately the end of May 2019.  The devices were securely stored in HSI's forensic computer lab.  Any additional review conducted by law enforcement before obtaining search warrants was limited to the portions extracted during the border search.  At no time after May 2019 did HSI expand the border search of these devices.

In October 2019, the government served Vasquez a target letter.  A short time later, he retained counsel and cooperated with law enforcement from October 2019 through March 2021.  Vasquez, represented by counsel, met with government counsel and special agents subject to a written proffer agreement.  There was no limitation on derivative use of his statements.  During a number of meetings while in a cooperating posture, the government reviewed with Vasquez certain chats obtained from his devices via the border search.  While Vasquez inquired about the timing of the return of the devices during the proffer sessions, at no time during these meetings did Vasquez or his counsel object to the review of this evidence from the devices at issue, or demand their return.  On March 22, 2021, Vasquez terminated his cooperation.

During proffer sessions, Vasquez provided additional email accounts that the government had not previously identified or fully understood the significance of during the border search review. After Vasquez ended his cooperation, the government obtained email search warrants for some of the email accounts identified by Vasquez during the proffer sessions, specifically email accounts Vasquez associated with individuals involved in the scheme.[3] The information HSI learned from this evidence supported new searches to pursue on the devices. Additionally, the government independently learned from co-conspirator Individual 1's Gmail account that Vasquez failed to inform the government that Individual 1 caused wire transfers to Bautista and was the beneficial owner of Belize Company 1, or that co-defendant Roger Piñate arranged for Vasquez to meet with Individual 1 in Weston, Florida in April 2016. The government confirmed that this meeting took place based on emails in Individual 1's Gmail account describing fake loan documents and service contracts to hide transactions involved in the conspiracy. In December 2021, the government applied for and obtained a search warrant (and follow-on warrant two weeks later) for the same devices imaged pursuant to the border search.[4] At no time did the government expand its original border search of the devices after May 2019 prior to obtaining the December 2021 search warrants.

In mid-2022, after developing additional evidence, the government contacted Vasquez's counsel to explore the possibility of revisiting his cooperation. In July 2022, Vasquez's counsel asked the government in writing to allow Vasquez to self-surrender. In August 2022, Vasquez's counsel orally requested the return of the devices during an in-person meeting at the U.S. Attorney's

---

[3] *See* case numbers 21-MJ-8148-WM (April 2021 search for co-defendant Piñate's Gmail account) and 21-MJ-8178-BE (May 2021 search warrant for co-defendant Piñate's second Gmail account, Individual 1's Gmail account, and another co-conspirator's Gmail account).
[4] *See* case numbers 21-MJ-04309-LOUIS and 21-MJ-04392-TORRES (December 2021 search warrants for Vasquez's laptop and iPhone).

Office. The government asked counsel to verify whether the devices belonged to Vasquez or Company 1. On September 7, 2022, defense counsel informed the government by email that the devices were Vasquez's personal property, not the property of his employer. That day, defense counsel requested in writing if the government "[w]ill . . . please arrange to return [the devices] to him." The government informed counsel that it could not return the devices to the extent any party later objected to chain of custody. The government agreed to provide Vasquez images of the devices and did so in June 2023.

## ARGUMENT

The Fourth Amendment guards against "unreasonable searches and seizures" and requires the government to obtain a warrant, issued upon probable cause, to search "persons, houses, papers, and effects." U.S. Const. amend. IV. There are, however, "specifically established and well-delineated exceptions" to the warrant requirement. *Katz v. United States*, 389 U.S. 347, 357 (1967). One "historically recognized exception" is searches at the nation's borders. *United States v. Ramsey*, 431 U.S. 606, 621 (1977). At the border and points of entry, "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). As a result, "[t]he Supreme Court has consistently held that border searches are not subject to the probable cause and warrant requirements of the Fourth Amendment." *United States v. Vega-Barvo*, 729 F.2d 1341, 1344 (11th Cir. 1984) (citing *Ramsey*, 431 U.S. at 617).

Moreover, "searches at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Ramsey*, 431 U.S. at 616. *See United States v. Montoya de Hernandez*, 473 U.S. 531, 539-41 (1985) ("[N]ot only is the expectation

7

of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border."). Nevertheless, there are safeguards in place to protect an individual's privacy at the border. Specifically, under the Supreme Court's two-prong test to evaluate border searches, courts must ensure that a border search (1) was authorized by statute, and (2) was reasonable. *See Ramsey*, 431 U.S. at 611-16.

## I. THE GOVERNMENT CONDUCTED A LAWFUL BORDER SEARCH.

### A. The Border Search was Authorized by Statute.

The following statutory provisions and implementing regulations expressly authorized the search at SFO airport—Vasquez's entry point into the U.S.:

> [19 U.S.C. §] 1496 states that a customs officer may examine "the baggage of any person arriving in the United States in order to ascertain what articles are contained therein," 19 U.S.C. § 1496, while [19 U.S.C. §] 1582 provides that "all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the [g]overnment," 19 U.S.C. § 1582. Section 162.6 [states] that "[a]ll persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a [c]ustoms officer. 19 C.F.R. § 162.6.

*United States v. Pulido*, No. 20-cr-292, 2021 WL 3476600, at *10 (M.D. Fla. July 2, 2021), *report and recommendation adopted*, 2021 WL 3471696, at *1 (M.D. Fla. Aug. 6, 2021). Further, Section 162.6 authorizes "[d]istrict directors and special agents in charge," including from HSI Miami "to cause inspection, examination, and search to be made" of "all persons, baggage, and merchandize arriving" at airports and other points of entry. The first prong of the test is not in dispute.

### B. The Border Search Exception Applies.

As a threshold matter, HSI conducted a valid border search when the devices were detained at SFO airport, searched at HSI Miami, and seized at HSI Miami when law enforcement identified

8

evidence of criminal activity on the devices. Courts have repeatedly found that "the border exception is not rendered inapplicable because a search initiated at a border ultimately is conducted at some physical or temporal remove." *United States v. Falzone*, No. 23-cr-351, 2024 WL 4164723, at *4 (M.D. Fla. July 29, 2024), *report and recommendation adopted*, 2024 WL 3964089 (M.D. Fla. Aug. 28, 2024) (citations omitted). "[A]n off-site forensic search of an electronic device over a long period of time is nonetheless a border search" where, as here, "the device was never cleared to pass through the border, and therefore the defendant never regained an expectation of privacy in the electronic device." *United States v. Kamaldoss*, No. 19-cr-543, 2022 WL 1200776, at *13 (E.D.N.Y. Apr. 22, 2022) (citing *United States v. Kolsuz*, 185 F. Supp. 3d 843, 851-52 (E.D. Va. 2016)), *aff'd*, 890 F.3d 133, *as amended* (May 18, 2018). "[I]t is a common practice at HSI for a phone to be sent to a different location from where it was initially seized in order to be searched." *United States v. Touray*, No. 20-cr-103, 2021 WL 6066101, *2 (N.D. Ga. Sept. 3, 2021) (applying the border search exception where HSI agents transported devices detained at JFK airport to Atlanta for forensic analysis).

Courts have routinely upheld the process used in this case as a valid border search. *See United States v. Quarles*, No. 21-cr-13, 2022 WL 3684661, at *1 (M.D. Fla. Aug. 25, 2022) (applying border search exception where the defendant's cell phone was seized upon his arrival at Port Canaveral and sent to HSI Tampa for further analysis); *see United States v. Brown*, No. 20-cr-113, 2021 WL 3828797, at *3 (N.D. Ga. Aug. 27, 2021) (applying border exception to HSI's search of the defendant's electronic devices several hundred miles from a border crossing and two weeks after the detention of the devices); *see Pulido*, 2021 WL 3476600, at *10 (finding a search of electronic devices consistent with the border search exception where CBP initially detained

9

electronic devices at the Dallas/Fort Worth International Airport and transported them to Tampa, Florida for further analysis); *see United States v. Nkongho*, No. 18-cr-0468, 2021 WL 4421883, *5 (D. Md. Sept. 27, 2021) (applying border search exception where CBP detained four cell phones and two laptops from the defendant at MIA airport and transported them to Maryland for forensic analysis). On the other hand, defendant Vasquez has identified no authority suggesting that transporting devices detained at SFO airport to HSI Miami for forensic analysis changed the nature of the border search. *See Pulido*, 2021 WL 3476600, at *12 (stating that the defendant "points to no authority holding that such practice is impermissible").

        **C.**        **Eleventh Circuit Law Governs the Border Search.**

"Nearly all of the district courts confronted with [the] issue" of devices detained in one district and transported to another "have found that the search should be governed by the law of the place *where the search occurred*." *United States v. Ayvazyan*, 20-cr-579, ECF No. 296 at 8 (C.D. Cal.) (emphasis added). *See also Pulido*, 2021 WL 3476600, at *11 (applying Eleventh Circuit border search precedent to a phone and laptop detained in the Fifth Circuit and searched in the Eleventh Circuit); *see Touray*, 2021 WL 6066101, *11 (applying Eleventh Circuit law to a search in Atlanta of devices detained in the Second Circuit); *see Nkongho*, 2021 WL 4421883, *5 (applying Fourth Circuit law to a search in Maryland following the detention of devices at MIA airport); *see United States v. Xiang*, No. 19-cr-980, 2021 WL 5772670, at *1 (E.D. Mo. July 23, 2021), *report and recommendation adopted*, 2021 WL 4810556 (E.D. Mo. 2021) (applying law of the Eighth Circuit—where the search occurred—to a border search of devices detained at Chicago O'Hare International Airport in the Seventh Circuit).

Defendant Vasquez claims *Ayvazyan* favors application of Ninth Circuit precedent. Not so.

10

There, an FBI agent in Los Angeles asked CBP officials in Miami to conduct a secondary screening of the defendants. *See Ayvazyan*, 20-cr-579, ECF No. 296 at 1-2. "Defendants arrived at the Miami airport and were referred by customs officials for a secondary screening." *Id.* at 2. "[C]ustoms agents interviewed Defendants multiple times and searched Defendants' luggage, wallets, and cell phones." *Id.* The court applied Eleventh Circuit law because the search occurred in Miami. *Ayvazyan* supports the application of Eleventh Circuit law in the instant case.

The court in *Ayvazyan* declined to apply Ninth Circuit law for reasons that apply here:

> Defendant's position would penalize officers' good faith efforts to comply with the law. It would also inhibit official interagency collaboration at the border, which is to be commended, not condemned. Indeed, under these facts, Defendants' rule would impose Ninth Circuit law in Miami—a jurisdiction governed by the Eleventh Circuit—and it would require Miami based officers to familiarize themselves with Ninth Circuit law before collaborating with Ninth Circuit agents.

*Id.* at 12 (internal citations omitted).[5] Here, the parties agree that "courts generally defer to the *lex loci – i.e.*, where the search or seizure occurred." Mot. 5. Consistent with this approach, the Court should apply the law of the Eleventh Circuit, where the search and seizure occurred.

### D. The Border Search Was Reasonable.

To determine whether a border search is reasonable under the Fourth Amendment, courts weigh the extent to which the search intrudes upon an individual's privacy against legitimate government interests. *See United States v. Alfaro-Moncada*, 607 F.3d 720, 727 (11th Cir. 2010). An

---

[5] Cases cited by the defendant outside of the border search context also support applying Eleventh Circuit law. While *United States v. Haack* involved a residential search warrant in California, the court applied Ninth Circuit law—the location of the search—because "the propriety of law enforcement's conduct should be determined by the law of the circuit in which their conduct occurred." No. 18-cr-928, 2024 WL 2747351, at *4 (D.N.M. May 29, 2024) (denying suppression). *United States v. Ozuna*, 129 F. Supp. 2d 1345, 1352 (S.D. Fla. 2001) addressed the admissibility under Rule 404(b) of the defendant's prior arrest by a State trooper in Maryland. The district court found the arrest reasonable under Fourth Circuit law—where the arrest occurred. *Id.* at 1355.

11

individual's right to privacy at the border is "qualitatively different" than inside the country. *Montoya de Hernandez*, 473 U.S. at 538. Here, defendant Vasquez relies heavily on the privacy interests described in *Riley v. California*, 573 U.S. 373, 386 (2014), where the Supreme Court exempted cell phone searches from warrantless searches incident to arrest. "Although the Supreme Court stressed in *Riley* that the search of a cell phone risks a significant intrusion on privacy . . . *Riley*, which involved the search-incident-to-arrest exception, does not apply to searches at the border." *United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018). *See United States v. Molina-Isidoro*, 884 F.3d 287, 292 (5th Cir. 2018) ("[I]t is telling that no post-*Riley* decision . . . has required a warrant for a border search of an electronic device.").

As detailed above, the investigation in this case by HSI's Illicit Proceeds and Foreign Corruption Investigations Group began more than a year before the border search. By the time of the secondary inspection, HSI had obtained and reviewed financial records revealing at least one million dollars in money transfers from shell companies in Hong Kong to Bautista's BEL account in Singapore and that the same shell companies also had wired funds to defendant Vasquez's front companies in the Southern District of Florida. HSI had further learned from payroll records and loan documents that defendant Vasquez was employed by Company 1, which had won a series of voting machine services contracts with the Philippines Commission on Elections (COMELEC). The unexplained wealth of the COMELEC Chairman (co-defendant Bautista) was the predicate for NBI's investigation as early as August 2017. HSI had reasonable suspicion of criminal activity at the time of the border search, which was briefly memorialized in the above Reasonable Suspicion Statement and requested and reviewed by the HSI agent who detained the devices. Subsequently, the government articulated probable cause in the search warrants applied for in December 2021.

12

The basis for the border search was well beyond what is required in this Circuit. "[I]n the Eleventh Circuit, border searches require *no suspicion* at all." *United States v. Haynes*, No. 19-cr-80045, 2020 WL 109061, at *1 (S.D. Fla. Jan. 8, 2020) (emphasis in original) (citing *Touset*, 890 F.3d at 1233). In *Touset*, the court reviewed Supreme Court and Circuit precedent and noted that the reasonable suspicion standard has been reserved "only for highly intrusive searches of a person's body." 890 F.3d at 1234 (internal quotations and citations omitted). The search of a person's *property*, on the other hand, "however non-routine and intrusive," requires no level of suspicion. *Id.* at 1233. The court concluded that "the Fourth Amendment does not require any suspicion for forensic searches of electronic devices at the border," and found no reason to give special treatment to electronic devices simply because "so many people now own them or because they can store vast quantities of records or effects." *Id.* at 1231, 1233. The court was "also unpersuaded that a traveler's privacy interest should be given greater weight than the interests [of the sovereign] in protecting . . . its territorial integrity." *Id.* (internal citations and quotations omitted). The Eleventh Circuit recently reaffirmed this view in *United States v. Fonseca*, 22-cr-13152, 2023 WL 7272320, at *2 (11th Cir. Nov. 3, 2023) (noting that the defendant "correctly admits that his first argument for suppression—that forensic searches of cellphones at the border still require individualized reasonable suspicion—is foreclosed by this Circuit's precedent").

Unlike the Eleventh Circuit, the Ninth Circuit has held that "border officials may conduct a forensic cell phone search only when they reasonably suspect that the cell phone contains contraband," not for general law enforcement purposes. *United States v. Cano*, 934 F.3d 1002, 1020 (9th Cir. 2019). In the Ninth Circuit, warrantless forensic searches of cell phones are impermissible when the agents merely suspect the phone will contain evidence "of past or future border-related

13

crimes." *Id.* *Cano*, however, was decided on August 16, 2019, more than four months after the devices were detained in this case. Even if the Court were to apply Ninth Circuit law, which is not warranted given the location of the search and seizure, the agents conducting the border search operated consistent with then-binding Circuit precedent. *See United States v. Aguilar*, 973 F.3d 445, 450 (5th Cir. 2020) ("Because *Cano* was decided after the search of Aguilar's phone, we do not consider its holding in assessing whether the agents acted in good faith. And, although Judge Costa's concurrence in *Molina-Isidoro* expressed similar concerns about allowing border cell phone searches for items other than contraband, *Cano* is the only case that we have found that requires a warrant to conduct a forensic data search at the border. We therefore think that, at the time of the forensic search, it was objectively reasonable for the CBP agents to conclude that reasonable suspicion was all they needed to conduct a forensic search of Aguilar's phone.") (citations omitted).[6]

The Court need not engage in a good faith exception analysis because the limited view of border search authority set forth in *Cano* has been expressly rejected by the Eleventh Circuit, where border searches do not require reasonable suspicion and are not limited to contraband. *See Touset*, 890 F.3d at 1231-34. *See also Pulido*, 2021 WL 3476600, at *9 ("It is important to highlight in this regard that the Supreme Court has rejected the distinction between evidence and contraband, stating that [n]othing in the language of the Fourth Amendment supports the distinction between mere evidence and instrumentalities, fruits of crime, or contraband.") (internal quotations omitted).

---

[6] Defendant Vasquez notes that *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) was on the books at the time of the border search. But it was not until *Cano* that the Ninth Circuit "clarif[ied] *Cotterman* by holding that 'reasonable suspicion' . . . means that officials must reasonably suspect that the cell phone contains digital contraband" and "conclude[d] that cell phone searches at the border, whether manual or forensic, must be limited in scope to a search for digital contraband." *Cano*, 934 F.3d at 1007. The need for the Ninth Circuit to clarify *Cotterman* underscores the agents' objectively reasonable interpretation of the law as of April 2019.

14

Courts in this Circuit have found substantially similar forensic examinations of electronic devices to be reasonable:

> In sum, given the absence of any explicit Supreme Court authority limiting border searches to contraband; the Supreme Court's broad pronouncements regarding the government's "paramount interest" in protecting and controlling its boundaries, *Flores-Montano*, 541 U.S. at 153, as compared with the diminished privacy expectations of travelers entering and exiting the country; the Eleventh Circuit's resistance to placing restrictions on the border search exception other than where the searches at issue involve physical contact between the searcher and the person searched, the exposure of intimate body parts, or the use of force—none of which are present here; and the Eleventh Circuit's emphasis on the need for judicial restraint in the highly sensitive area of border crossings, I find that HSI's forensic examination of [the defendant's] iPhone and MacBook, along with [the agent's] subsequent reading of the messages on those devices, was reasonable.

*Pulido*, 2021 WL 3476600, at *10 (internal citations omitted).

### E. The Timing of the Warrant was Reasonable Under the Circumstances.

The government lawfully detained, seized, and searched the devices without a warrant pursuant to valid border search authority. "[T]he border search exception . . . allows for searches to be conducted over a longer period of time and is not subject to the same temporal constraints as a *Terry* stop, for example." *Nkongho*, 2021 WL 4421883, at *6 (noting that other courts had noted that "an off-site forensic search of an electronic device over a long period of time is nonetheless a border search" and that border searches of a device "may take days or perhaps weeks or even months") (internal quotations omitted). A court in this Circuit recently noted that "there is no bright-line rule" to determine if delay in seeking a warrant has transformed "a reasonable seizure into an unreasonable seizure" and that "it is not clear if or how any delay should be reviewed in the context of a border search." *United States v. Quarles*, 2022 WL 3684661, at *2 (finding that a 47-day delay in seeking a warrant was reasonable following a valid border seizure of electronic devices at Port

15

Canaveral).[7]

Here, HSI expeditiously reviewed the devices pursuant to border search authority before seizing them in Miami after identifying evidence of criminal activity. Once the phone and laptop were seized, the government limited its review to portions of the devices identified as relevant to the investigation and extracted as part of the border search. HSI did not otherwise expand the border search. Nothing prevented the agents from reviewing the extracted forensic materials lawfully in their possession.

Defendant Vasquez attempts to argue that there was a "32-month" delay between the border search and search warrant. However, as set forth above, the government did not need a warrant and did not rely on a warrant in conducting its border search of the devices. Defendant Vasquez's reliance on cases addressing delays in seeking a search warrant is misplaced because those cases, unlike here, required a warrant to search the items in the first place. *See*, *e.g.*, *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) (addressing a package seized pursuant to a business search warrant); *United States v. Mitchell*, 565 F.3d 1347, 1350 (11th Cir. 2009) (hard drive obtained by consent during "knock and talk"); *United States v. Laist*, 702 F.3d 608, 613-14 (11th Cir. 2012) (upholding a 25-day delay obtaining a warrant after the defendant consented to the search of hard drives); *United States v. Sparks*, 806 F.3d 1323, 1349 (11th Cir. 2015) (declining to reach whether a 23-day delay in seeking a warrant was reasonable where the defendant left his phone at Walmart); *Thomas v. United States*, 775 Fed. App'x 477, 490 (11th Cir. 2019) (upholding a 33-day delay in seeking a warrant where the defendant's wife alerted law enforcement to illicit materials on the

---

[7] Defendant Vasquez notes that he needed his devices returned "because they contained technical information crucial to the functioning of [his] businesses," Mot. 11, but fails to cite any authority suppressing evidence or invalidating a search based on extended retention of a device.

16

defendant's computer and consented to the search).

The only case cited by defendant Vasquez addressing the timing of a search warrant following a border search is *United States v. Rubinstein*, No. 09-cr-20611, 2010 WL 2723186, at *12 (S.D. Fla. 2010), an inapposite case that does not appear to have been cited by any court in the past ten years. There, the court addressed the reasonableness of law enforcement's efforts to seek search warrants after various devices were located pursuant to a residential search warrant. *Id.* at *1-14. The court further addressed a subsequent search of the defendant's laptop at MIA airport, where he was arrested following the discovery at the airport of illicit materials on his laptop. *Id.* Without the benefit of the body of border search cases that has developed in the past 15 years, the court appears to have analogized an airport search to non-border situations where probable cause is required. *See id.* at *13 (relying on the residential "knock and talk" in *Mitchell*).

The court noted that "a seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment[]." *Id.* at *13 (quotations omitted). The court noted "[t]he reasonableness of the delay is determined in light of all the facts and circumstances, and on a case-by-case basis. The reasonableness determination will reflect a careful balancing of governmental and private interests." *Id.* (citing *Mitchell*, 565 F.3d at 1351). With respect to the laptop seized and searched at the airport, the court found that a 41-day delay in seeking a search warrant was unreasonable, largely because "[t]he government offered no explanation for the forty-one day delay in applying for th[e] search warrant and presented no evidence in this regard." *Id.* at *13-14.

That is not the situation here. As defendant Vasquez acknowledges, following the border search, he attended "multiple meetings with the government" while he "was cooperating with the

government." Mot. 2, 12. During these meetings in a posture of cooperation, the government walked through in detail with defendant Vasquez his chats and other contents of the devices. While he inquired about the timing of the return of the devices at SFO airport and during the proffer sessions, courts have said such requests "can be revealing," but are not dispositive, particularly when balanced against considerations like investigative integrity and chain of custody objections. *Thomas*, 775 Fed. Appx. at 490. At no time during these meetings did Vasquez or his counsel object to reviewing the contents of the devices with the government.[8] Nor did defendant Vasquez file a motion for the return of property under Federal Rule of Criminal Procedure 41(g), which provides relief in district court to any "person aggrieved by an unlawful search and seizure of property or by the deprivation of property."

After Vasquez ended his cooperation on March 22, 2021, the government obtained email search warrants for private email accounts associated with others involved in the scheme. These search warrant returns supported new searches to pursue on the devices. Rather than expanding the border search to encompass these new leads, in December 2021, the government applied for and obtained a search warrant and follow-on warrant for the same devices that were the subjects of the border search. Given defendant Vasquez's undisputed cooperation for much of the time between the border search and the search warrant, and lack of any objection to reviewing the devices with the government, any delay in seeking a search warrant did not render the search unreasonable, much less warrant suppression of evidence lawfully obtained by the government.

---

[8] Defendant Vasquez's review of the contents of the devices amounted to consent, which in this Circuit "need not be explicit" to give an agent "an objectively reasonable, good faith belief that he has such consent." *Lawrence v. Gwinnet County*, 557 Fed. Appx. 864, 871 (11th Cir. 2014).

## II. THE GOVERNMENT OBTAINED VALID SEARCH WARRANTS.

On the final page of his motion, defendant Vasquez challenges the search warrants obtained by the government as purported "fruits of [an] illegal search." Mot. 15. As described above, because the devices were searched in the course of a valid exercise of the government's border search authority, there was nothing that could "taint" the search warrants. In any event, defendant Vasquez acknowledges that "SA Almeida's affidavit uses evidence from other sources to establish probable cause." Mot. 15. Indeed, the search warrant applications were predicated in substantial part on evidence developed over the course of more than a year before the border search, as well as significant independent source evidence developed after the border search, including email search warrant returns for the private email accounts of other involved individuals. *See United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012) ("[E]vidence obtained from a lawful source that is independent of any Fourth Amendment violation is admissible, the rationale being that the exclusionary rule should not put the government in a worse position than if the constitutional violation had not occurred.") (citing *Murray v. United States*, 487 U.S. 533, 538 (1988)). There is no basis to exclude evidence obtained as a result of the search warrants.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant Vasquez's motion to suppress.

Respectfully submitted,

LORINDA LARYEA  
Acting Chief

HAYDEN O'BYRNE  
United States Attorney

*/s/ Mike DiLorenzo*  
*/s/ Connor Mullin*  
*/s/ Jil Simon*

*/s/ Robert J. Emery*

19

| | |
|---|---|
| MICHAEL C. DILORENZO | ROBERT J. EMERY |
| CONNOR MULLIN (A5503233) | Assistant U.S. Attorney |
| JIL SIMON | Southern District of Florida |
| Fraud Section, Criminal Division | Court ID No. A5501892 |
| U.S. Department of Justice | 99 Northeast 4th Street |
| 1400 New York Avenue NW | Miami, Florida 33132-2111 |
| Washington, DC 20530 | Tel: (305) 961-9421 |
| Tel: (202) 514-1973 | Robert.Emery2@usdoj.gov |
| connor.mullin2@usdoj.gov | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via CM/ECF on April 21, 2025, and therefore on counsel of record.

/s/ *Connor Mullin*
Connor Mullin
Trial Attorney